IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| WERTH FAMILY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110652C |
| | ) | |
| v. | ) | |
| | ) | |
| YAMHILL COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **CORRECTED DECISION** |

This Corrected Decision is issued to resolve a typographical error on page nine of the

original Decision, entered on December 12, 2012. In that Decision, the word "lost" should have

been expressed as "lots." The Corrected Decision has been reformatted; in all other respects, the

Decision remains unchanged.

Plaintiff appeals the valuation of 67[1] tax lots (subject property), for the 2010-11 tax year.

Trial was held in the Oregon Tax Courtroom in Salem on September 21, 2012. Plaintiff was

represented by Christopher K. Robinson (Robinson), Attorney at Law. Mike Gougler (Gougler),

and Matt Willcuts (Willcuts) testified on behalf of Plaintiff. Chris Lanegan (Lanegan),

Registered Appraiser Analyst II, represented and testified on behalf of Defendant. Jeff Ivie,

Chief Appraiser, and Susan DeBolt, Registered Appraiser Analyst II, appeared on behalf of

Defendant. Craig Zell (Zell), MAI, SRA, testified on behalf of both Plaintiff and Defendant.

Plaintiff's Exhibits 1 through 8, Plaintiff's Rebuttal Exhibits 9 through 12, 15,16 and

/ / /

---

[1] Account numbers: 536497, 536533, 536578, 536581, 536584, 536593, 536596, 536599, 536602, 536614, 536617, 536641, 536659, 536662, 536671, 536674, 536686, 538414, 538417, 538420, 538423, 538426, 538429, 538432, 538435, 538438, 538441, 538444, 538450, 538456, 538459, 538462, 538465, 538468, 538471, 538474, 538477, 538480, 538483, 538486, 538489, 538492, 538495, 538498, 538501, 538504, 538507, 538510, 538513, 538516, 538519, 538522, 538525, 538528, 538531, 538534, 538537, 538540, 538543, 538546, 538549, 538552, 538555, 538558, 538561, 538564, 538567.

Defendant's Exhibits A through D were admitted without objection. Defendant's Rebuttal Exhibit F was discussed, but not introduced, and it was not admitted.

The court issued an Order filed July 20, 2012, stopping the accrual of interest from July 19, 2012 to September 21, 2012, on any potential property tax refund from Defendant. The court's July 20, 2012, Order is incorporated herein by reference.

## I. STATEMENT OF FACTS

The subject property is part of the "golf course community of The Greens at Springbrook" located in Newberg, Oregon. (Ptf's Ex 1 at 5.) As of the assessment date, each tax lot was a bare land lot that had been platted for a single family residence. (*Id.* at 6.) Originally, the entire subdivision was to be developed by DR Horton in phases subject to an agreement between DR Horton and Plaintiff. (*Id.*) The agreement called for DR Horton to "purchase the entire subject subdivision at $87,500 per lot * * *." (*Id.* at 32.) Gougler testified that DR Horton followed the agreement until September 2009 when DR Horton stopped purchasing lots to build homes and walked away from the project, leaving 67 lots undeveloped. (*See id.* at 6.) Of the 67 remaining lots "23 of the subject lots back to the golf course." (*Id.* at 5.) The remaining lots are "on the peripheral, many of which are daylight basement lots." (*Id.*) 18 of the lots have a 20' wide easement for a "natural gas pipeline as well as [a] public water line and pedestrian path." (*Id.* at 17.) Overall, the lots vary in size from "5,008 square feet to 12,478 square feet with an average of 6,837 square feet." (*Id.* at 5.) Gougler testified that DR Horton had used its discretion under the terms of the previous agreement and "cherry picked" the best lots to build single family residences.

Gougler testified that Plaintiff received two letters of intent from DR Horton to purchase the remaining lots subsequent to DR Horton walking away from the project. The letters of intent

were dated October 4, 2010, and December 31, 2010. (Ptf's Exs 2, 3.) The October 4, 2010, offer was for 10 lots, valuing the golf course lots at $82,000 each and the "Non-Golf Course Lot[s]" at $40,500 each. (Ptf's Ex 2 at 1.) The December 31, 2010, offer was for 66 lots, with a "Base Purchase Price" of $3,250,976 plus "Additional Consideration." (Ptf's Ex 3 at 1; Def's Ex D at 4.) Gougler testified that the December offer was actually for 67 lots and the price per lot was $48,522. Gougler testified that the Plaintiff rejected both offers.

On cross examination, Gougler testified that the original 2004 agreement with DR Horton was "a bulk agreement on price, but not a sale." Gougler testified on cross examination that under the original agreement Plaintiff had control over which phase was to be built next, but not over the order the individual lots were built on within each phase. Gougler testified on cross examination that there was a market change between the assessment date and the dates of two letters of intent from DR Horton.

The parties agree that the subject property's highest and best use is the development of single family residences. (Ptf's Ex 1 at 6; Def's Ex A at 6.)

Zell testified that he prepared the appraisal report for Plaintiff. Zell testified that he considered the sales comparison approach, the cost approach, and the income approach to value the subject property. (Ptf's Ex 1 at 29.) Zell concluded that the cost approach and income approach were not appropriate methods for valuing bare lots and did not use them. (*Id.*) Zell was only able to find nine comparable sales to use in the sales comparison approach, which was "inadequate in the valuation of 67 superior lots." (*Id.*) "[W]hen inadequate sales data exists from which to form an opinion of value, other methods must be used." (*Id.*) Zell decided to use "a lot to improvement ratio analysis" to value the subject property. (*Id.*) "The lot to

/ / /

improvement ratio * * * is the relationship between the finished home value and the lot value."
(*Id.* at 31.)

Zell then compared 16 completed home sales located in Tigard, Beaverton, and Hillsboro. (*Id.* at 32.) The lots ranged in size from 3,920 square-feet to 8,274 square-feet, sold for prices ranging from $75,000 to $125,000, and had sales dates ranging from September 2009 to June 2011. (*Id.* at 32.) The completed houses sold for between $289,900 and $580,000, with sales dates ranging from March 2010 to June 2012. (*Id.* at 32.) Relying on this data Zell calculated a lot to improvement ratio for each lot. (*Id.*) The lot to improvement ratios ranged from 21.1 percent to 28.0 percent, with an average of 24.2 percent. (*Id.*)

Gougler testified that as a builder he would lose money if he exceeds a 25 percent "lot cost ratio." Willcuts testified that "if a builder wants to make money" you have to "stick with a 25 percent" lot cost ratio. Zell also stated that it is a "general rule of thumb in the building industry that the lot value should be 25 percent of home value." (*See id.* at 31.) On cross examination, Zell testified that he did not include data for the basis of his 25 percent rule of thumb, but that it was based on his experience as an appraiser and knowledge of the market.

Zell testified that he applied a 25 percent lot to improvement ratio to recent home sales in the subject property's same development. (*See id.* at 33.) Zell's method established lot values ranging from $66,309 to $125,000. (*Id.*) Zell testified that he categorized the sales by the average square-feet of the lot and extracted an adjustment for "Golf Course/Greenspace" lots of "6%." (*See id.* at 34.) Zell testified that he "applied modest subjective adjustments" for lots with irregularities such as "shape, size, [or] topography." (*See id.*) From this analysis, Zell testified that he concluded "[t]he total aggregate value of the subject [property] is * * * $5,366,000."
(*Id.*)

Zell testified that the comparables used in the appraisal report were all bank sales from neighboring markets and that the market was "80-90 percent real estate owned," foreclosures, or short sales. Zell testified that as of the valuation date the market conditions "were terrible" and that there was a large inventory of vacant lots. Zell testified on cross examination that he included both bulk sales and individual lot sales in his appraisal. Zell testified on cross examination that he "did not do a thorough analysis of the difference between lot purchases in distress versus non lot purchases in distress."

Lanegan presented a "Summary Appraisal Report" to support Defendant's request that the Board of Property Tax Appeals values be upheld. (Def's Ex A.) Like Zell, Lanegan testified that he also considered the income approach, the cost approach, and a comparable sales analysis to determine the subject property's real market value. (*See id.* at 16.) He testified that he concluded that the income and cost approaches were inappropriate to value the subject property's real market value. (*See id.*) Lanegan testified that "[t]here were no comparable vacant land sales * * * inside the city limits of Newberg as of Jan. 1, 2009 to Dec. 31, 2009." (*See id.*) He noted that "there has been a sale after the effective date of this appraisal of a vacant parcel." (*Id.*) Lanegan stated that "[t]his parcel is located outside the subdivision of The Greens and is located inside the city limits of Newberg. (*Id.*) He described the parcel as measuring 7,500 square-feet, located in an area zoned for "single family residential," and sold on March 30, 2010, for $98,000. (*Id.*)

Lanegan testified that he relied on the "extraction and allocation methods * * * using sold properties" located in the subject property's neighborhood that he "considered to be Market Sales." (*See id.*) Lanegan testified that the appropriate method of valuation was to determine the subject property's real market value of each lot separately rather than as a single unit subject to a

bulk discount. He testified that an appropriate lot cost factor would be 35 percent for the subject property. Lanegan presented evidence to support a 35 percent lot cost factor, relying on building costs from a local builder. (*Id.* at 18.) Using seven comparable properties located in the subject property's same development, Lanegan concluded an "Average % Extracted Lot Value" of 35.35 percent, and a "Geomean % Extracted Lot Value" of 35.01 percent. (*Id.*) Using his extraction approach, Lanegan concluded that the "lots range from $98,175 and $123,041," supporting the "estimated lot value of $109,000 for non-golf course lots" and $115,000 for the golf course lots. (*Id.* at 18-21.)

On cross examination Lanegan testified that the information used for his calculations was supplied by Mike Bettinelli (Bettinelli), a local builder, but that he "was not sure by what method the County obtained the data." Lanegan's analysis stated that Bettinelli purchased each of the seven lots for $165,000 and sold the seven lots after constructing single family residence at prices ranging from $275,000 to $360,000. Lanegan testified that the county will call local builders to get a local cost factor, but was unsure if that was the method used to obtain the information used in his analysis. Zell testified that "[t]here is no explanation or support for the amount of profit, when in fact if the county's 35% lot cost were used a level of profit would drop to the point that no builder would take the risk of building a home on this price of lot. * * * This clearly demonstrates that a builder can come closer to assuring himself a reasonable profit margin at a 25% ratio to sales price and value for a lot that is reasonable in the market." (*See* Ptf's Rebuttal Ex 9 at 2.) Zell challenged Lanegan's "adjustment of the sales process in a declining market." (*Id.* at 1.) He stated:

> "For instance, Lot #2 in Masters Glen sold for $60,000 on 10/1/2010 and the appraiser adjusted this value 8% for a retroactive sales price of $388,800. When the listing history of the property is researched, we find that the property was listed for $369,900 beginning on 11/4/2009. Therefore, it is illogical to conclude

that property was worth $388,800 when it failed to sell for the lower price of $369,900 at that time. The same is true of lots 12 and 13. Each was marketed for moths at a higher price and did not sell."

(*Id.*) Zell concluded that Lanegan's "extracted" lot prices were overstated.

Lanegan presented evidence of a proposal to purchase the subject property, dated April 2009, with a "land ratio to sale price" ranging from 29 percent to 38 percent. (Def's Ex B at 2-4.) This proposal also valued eleven golf course lots at $125,000 each. (*Id.* at 3.) On cross examination, Lanegan testified that the proposal used projected costs or an estimate of costs, which Lanegan believed were an accurate reflection of what the actual building costs would be. Lanegan testified on cross examination that he did not use any sales of the lots in the proposal in his analysis. Plaintiff offered email and correspondence from other builders, stating that individual lots in the subject property development should be valued at $20,00, $38,000, $41,146, $45,000, $70,000, and $70,625. (Ptf's Exs 10,11,12 at 4.)

Plaintiff requested that the value of the lots be reduced to a total of $5,366,000. (Ptf's Ex 1 at 2.) Lanegan requested that the Board of Property Tax Appeals' values be upheld, valuing flat and daylight basement lots at $109,000 and golf course lots at $115,000. (Def's Ex A at 4.) The parties agree that the subject property's highest and best use is development of single family residences. (Ptf's Ex 1 at 6; Def's Ex A at 6.)

## II. ANALYSIS

The issue before the court is the value of 67 individual lots as of the assessment date, January 1, 2010. ORS 308.210.[2] In Oregon, all real property "not exempt from ad valorem property taxation * * * shall be valued at 100 percent of its real market value." ORS 308.232. Real market value is defined as the "amount in cash that could reasonably be expected to be paid

[2] All references to the Oregon Revised Statutes (ORS) and the Oregon Administrative Rules (OAR) are to 2009, unless otherwise indicated.

by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2).

"In all proceedings before the * * * tax court * * * a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation." ORS 305.427. "Preponderance of the evidence means the greater weight of evidence, the more convincing evidence. *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). In this case, Plaintiff, as the one seeking affirmative relief, bears the burden of proof.

A.      *Valuation method*

The valuation approach to be used "is a question of fact to be determined upon the record." *Pacific Power & Light Co. v. Dept. of Revenue.* 286 Or 529, 533, 596 P2d 912 (1979). "For the valuation of real property all three approaches-sales comparison approach, cost approach, and income approach-must be considered." OAR 150-308.205-(A)(2)(a). Zell and Lanegan each considered all three approaches, concluding that the cost approach and income approach were not appropriate, and that there were not enough comparable sales for the sales comparison approach. (Ptf's Ex 1 at 29; Def's Ex A at 16-17.) After having considered the three approaches, both parties concluded that those approaches were not reliable to determine the subject property's real market value.

Zell and Lanegan both relied on the allocation method, each utilizing his own variation of that method.[3] (*Id.*) The allocation method is defined at a "ratio of site value to property value *

_____

[3] Zell referred to his method as a "lot cost ratio" while Lanegan referred to his method as an extraction or allocation method. The court refers to both methods as the allocation method as that is the term used by *The*

* * extracted from comparable sales in competitive locations and applied to the sale price of the subject property to develop the site value." Appraisal Institute, *The Appraisal of Real Estate* 363 (13[th] ed 2008). "This technique is applicable when [v]aluing one-unit residential lots where ample sales of both lots and improved homes are available for comparison purposes." (*Id.*) The court accepts the parties' conclusion that the allocation method is the appropriate method to determine the subject property's real market value.

B.    *Lot to improvement ratio*

Plaintiff's appraiser's analysis followed the textbook definition of the allocation method. Zell chose 16 completed home sales and compared the completed home sale price to the sale price of the lot. (Ptf's Ex 1 at 32.) Zell used sales from the surrounding areas, but did not use any sales from "The Greens at Springbrook" development, or from the city of Newberg. (Ptf's Ex 1 at 31.) Zell explained that "the lack of data in Yamhill County" hampered his choice of comparable properties. (*Id.*) Defendant criticized the location of Zell's choice of sales, but Defendant offered no evidence of sales from "The Greens at Springbrook" development in the city of Newberg that were comparable to the subject property.

Zell selected bare lots with sale dates ranging from September 2009 to June 2011. (*Id.* at 32.) These lots subsequently had completed home sales dates ranging from March 2011 to June 2012. (*Id.*) Zell testified that all of the completed home sales used were bank sales. Sell testified that the market was 80-90 percent distress sales. Defendant criticized Zell for selecting bank owned properties and disputed that the Yamhill County market was "80-90 percent distress" sales. (Def's Ex A at 15.) Plaintiff is relying on this evidence, not as comparable sales to the subject property, but as evidence that the lots to improvement ratio is a relatively stable

---

*Appraisal of Real Estate* 13th Edition.

percentage among comparable property. Defendant offered no rebuttal evidence identifying non-bank owned properties and did not determine a lot to improvement ratio different than that determined by Zell.

Lanegan used the "extraction and allocation methods" to value the subject property. (Def's Ex A at 16.) Lanegan used "sold properties" from the subject property's neighborhood he "considered to be Market Sales" with prices adjusted for time. (*Id.*) Lanegan testified that he used actual costs from a local builder as the basis for his analysis, as well as the "State of Oregon Cost Factor Book." (*See id.* at 17.) Lanegan also testified that he was unsure of how the Assessor's Office obtained the local builders data; the builder who allegedly provided the data did not testify. The court was not afforded an opportunity to verify the builder's cost data's applicability to the subject property's assessment tax year, and the court gives not weight to that data.

Given the testimony and evidence regarding the difficult market conditions as of the assessment date, the court finds that the market for bare lots as of the assessment date was virtually non-existent. The court accepts Plaintiff's evidence of the lot to improvement ratio, and accepts a lot to improvement ratio for the subject property of 25 percent.

C.      *Valuation of the individual lots*

Zell applied the 25 percent lot to improvement ratio to home sales in the subject property's development that occurred between January 2009 and April 2010. (Ptf's Ex 1 at 33.) From this analysis, Zell found lot values ranging from $66,309 to $125,000. (*Id.*) Zell then broke the lots into groups based on lot size and averaged the values in each category. (*Id.* at 34.) Zell applied a six percent premium for golf course and green space lots as well as "modest subjective adjustments" for lots with irregularities such as "shape, size, [or] topography." (*Id.*)

Lanegan testified that the "lots should be valued separately," concluding that there were only two types of lots: golf course or non-golf course. (*See* Def's Ex A at 17.) Lanegan concluded a value of $109,000 for flat and daylight basement lots, and $115,000 for golf course lots. (*Id.* at 21.) The difference between the determined real market value for "flat and daylight basement lots" and "golf course lots" is $6,000, or 5.2 percent premium for golf course lots. Lanegan did not make any other adjustments to the lots for location, shape, or size.

The parties are in agreement that there is a premium for the golf course and open space lots as compared to a similar lot that is not on the golf course or adjacent to open space. The parties are close to agreement as to the value of that premium. The court accepts Zell's six percent premium.

The court finds that each lot should be valued individually. Based on the evidence and testimony the court agrees that adjustments need to be made for the individual characteristics of the lots. There was no evidence show that Zell's subjective adjustments were not appropriate.

Zell's final real market value for each lot is supported by the evidence submitted. Zell's real market value determination of the golf course lots ranged from $85,000 to $110,000. (Ptf's Ex 1 at 35.) Plaintiff previously rejected an October 2010 purchase offer for the same golf course lots at a value of $82,000 per lot, and Plaintiff rejected a December 2010 offer with an average lot value of $48,522. (Ptf's Exs 2, 3.) Without knowing which lots were involved in the first rejected offer, it is impossible to do a direct lot for lot value comparison, but the real market values Zell placed on the lots support Plaintiff's reject of the October 2010 offer for the golf course lots because the offer was too low. Zell's valuation placed an average value on the lots of $80,090 (rounded).[4] The December 2010 rejected offer placed an average value on 67 lots of

---

[4] Zell's total valuation of the 67 lots is $5,366,000, resulting in an average of $80,089.55. (Ptf's Ex 1 at 36.)

$48, 522 before other "additional consideration." (Ptf's Ex 3 at 1.) Plaintiff's rejection of that offer is supported by Zell's real market value determination. Zell's valuation is supported by the testimony that a majority of the higher valued lots had already been sold, leaving primarily inferior vacant lots. The court accepts Zells' real market value determination.

III. CONCLUSION

After carefully considering of all the evidence and testimony, the court concludes that the market for bare lots was limited as of the assessment date, and that there was not enough market activity to use a comparable sales analysis. The court accepts the lot to improvement ratio as the best evidence for the value of the subject property given the ample sales of lots and improved homes in competitive locations as identified by Zell. Plaintiff carried its burden of proof and the court accepts Plaintiff's real market value of the subject property and as listed in Plaintiff's Exhibit 1 on page 35. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's requested relief at trial is granted.

IT IS THE FURTHER DECISION OF THIS COURT that no interest shall have accrued from July 19, 2012, to September 21, 2012, on any potential refund due to Plaintiff.

Dated this ____ day of December 2012.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*
*This Corrected Decision was signed by Presiding Magistrate Jill A. Tanner on December 12, 2012. The Court filed and entered this Corrected Decision on December 12, 2012.*